# PENRY ANALYTICS

March 4, 2026

The Honorable Karen K. Caldwell
United States District Court
Eastern District of Kentucky
101 Barr Street
Lexington, KY 40507

Re: United States of America v. Terence Lorenzo Clemons (0643 5:25-CR-030-KKC-01)

Dear Judge Caldwell:

My name is Christine Penry, and I was asked by counsel for Mr. Terence Clemons to conduct a social history investigation and prepare this narrative to assist the Court in evaluating the circumstances relevant to sentencing. Attached you will find my CV and credentials. The information provided below was gathered from interviews with Terence Clemons, his mother, Dorothy Clemons, his brother, Chadwick Clemons, and his son, Brayden Clemons.

In addition to interviews with family, I also reviewed United States District Court for the Eastern District of Kentucky documents, University of Kentucky (UK) Cooperative Extension employment records, military records from the Kentucky Army National Guard and United States Army, military commendations and service recognition materials, medical records from CHI St. Joseph Hospital, mental health records from New Vista of the Bluegrass, Inc., professional certifications and awards related to youth development and public service, as well as his Presentence Investigation Report prepared by Senior United States Probation Officer, J. Troy Brown.

**Family Background**

Terence was born on December 20, 1973, at St. Mary's Child's Hospital in Mt. Sterling, Kentucky to Dorothy and Chester Clemons. His parents married approximately six months after his birth. Terence has one younger brother, Chadwick "Chad" Clemons, age 50. Terence's father, Chester died in 2020 after a three-year battle with lung cancer.

Terence's mother, Dorothy, was born on February 15, 1953, in Marysville, Kentucky to Lula Bolden and Marshall Williams. At the time of Dorothy's birth, Lula was married to a different man named Claude Johnson, but she became pregnant with Dorothy by Marshall Williams. Marshall, a World War II veteran, left for military service again approximately one month before Dorothy was born and never knew of her existence until she was an adult.

Because of Lula's infidelity surrounding the pregnancy, she and Claude separated for a

1

period of time. During this separation, Dorothy was sent to live with her maternal grandmother, Hallie Bolden. Dorothy was seven years old when she learned that Hallie was not her biological mother.

As a result, Dorothy's early childhood was marked by profound instability in parental relationships. She was raised primarily by her grandmother rather than her mother, the man married to her mother was not her biological father, and her biological father remained unaware that she existed until much later in life.

Lula had nine additional children after Dorothy was born, seven of them with Claude. Dorothy explained that Claude frequently left the household during periods when her mother was pregnant, leaving Lula to care for the children alone. The family lived in significant poverty, and the siblings often relied on one another for basic care.

Dorothy recalled that during this period her mother experienced what the family described as a "nervous breakdown." Dorothy explained that each time Claude left the household, her mother would become emotionally unstable and unable to function. During these periods, the family had very little food or resources. Dorothy was responsible for carrying firewood and water inside.

Eventually, child welfare authorities intervened, and the children were placed in foster care. Dorothy attended a private school while her mother was hospitalized at Eastern State Mental Hospital. The siblings were separated during this time and were not reunited until later in adulthood. Dorothy was twenty when she discovered that Marshall, not Claude, was her biological father. Dorothy reconnected with Marshall after high school through extended family members, marking the first time Marshall was made aware of his daughter.

Despite these early disruptions, Dorothy graduated from Bath County High School in 1972 and briefly attended Midway Junior College, where she initially studied education. After leaving Midway, she enrolled in a business program at Montgomery County Vocational School while working night shifts at a nursing home to support herself. Dorothy met Terence's father, Chester, while still in high school, and her pregnancy with Terence came unexpectedly shortly after her graduation. The two married in 1973 several months after Terence's birth and established their household in Sharpsburg, Kentucky.

Three years after Terence was born, Dorothy's mother died in a car accident, effectively eliminating her only source of family support at the time. Although Dorothy's childhood involved prolonged separation from her mother, the two had reconnected after Terence was born and had begun rebuilding their relationship.

Terence explained that the loss was particularly difficult for Dorothy because she had relied on her mother for help caring for the boys during periods when work demands and growing strain within the household left her managing much of the responsibility on her own.

2

Dorothy's early life shaped the way she later managed her own home. Having grown up amid poverty, fractured caregiving, and periods of maternal psychiatric crisis, she learned to survive through endurance, self-sufficiency, and control. She worked hard to provide for her children, but the home Terence grew up in offered little room for standard childhood development. As a result, he learned to manage early developmental milestones and emotional growth on his own.

**Financial Instability and Emotional Development in a Restrained Family System**

Dorothy said their beginning together as a family was exceedingly difficult financially. They lived in rental homes and moved around between Mt. Sterling and Sharpsburg, Kentucky. Dorothy worked as a store clerk at Maloney's and Terence's father, Chester, worked at Hobart's factory, where he was employed for twenty years before taking a job at Montgomery County Schools in maintenance.

Dorothy explained that the pressures of financial hardship and her own childhood experiences shaped the way she approached family life. She stated, "Things were very hard, but I made it happen. In the process of being strong, I think I alienated their father. I took on every task after witnessing my mother allow Claude to treat her the way he did, so I operated under the assumption that Chester might leave one day." Dorothy explained that she never wanted to find herself in a position where a man controlled the outcome of her life. In trying to protect herself and her children from the instability she experienced growing up, she relied heavily on independence and control. Yet over time, that same determination also shaped family dynamics in ways that limited emotional connection within the household.

Terence's brother, Chad, similarly recalled that emotional expression was nonexistent at home and described his parents as "cold." He explained that they rarely showed affection toward one another or toward their children. While their mother was primarily responsible for raising them and meeting their basic needs, Chad described the household as one in which the boys were expected to behave "like men."

Terence said that during his first few years the family lived on Estell Street in Mt. Sterling, where he shared a bedroom with his younger brother, Chad. He described the neighborhood as a small area with older homes that were falling apart. Terence remembers that the house was often very cold during the winter months and recalled seeing mice in the home.

Chad confirmed that during their early childhood the family lived in a neighborhood with significant poverty and he and Terence spent substantial time outside with limited adult supervision while both parents worked. Looking back, he said that this exposed him and Terence to behavior and situations that were well beyond what would have been appropriate for children their age.

Chad recalled several incidents that occurred when he and Terence were five and six

3

years old. According to Chad, two older girls in the neighborhood, who were eleven and twelve at the time, approached them on multiple occasions and encouraged them to participate in sexually inappropriate behavior. Chad explained that the girls would lead them to secluded areas such as empty sheds or abandoned buildings and pressure them to expose themselves and engage in physical contact.

Because both parents worked long hours, Dorothy relied heavily on extended family and community members for childcare. Terence and his younger brother were frequently shifted around to different homes including their godmother, Joyce Wilson, and at other times their paternal grandparents, Christine and Harrison Clemons. As a result, much of Terence's early childhood was spent moving between households and caregivers depending on work schedules. Rather than growing up within a single, predictable caregiving structure, he adjusted to different adults, expectations, and routines from one setting to another.

In addition to working outside the home, Dorothy was responsible for most of the household duties, including cooking and cleaning. Chester primarily handled discipline for the children. Terence recalled that punishment was administered with a belt or a switch to the body.

Terence said that when his mother was home caring for the children in the evenings and on weekends, his father was often away drinking alcohol and smoking marijuana with friends and extended family members in Sharpsburg. When he returned home after these absences, he frequently came back angry and yelling, creating tension and unease.

Substance use was common among many male relatives in the family. Terence said that uncles, cousins, and family friends frequently smoked marijuana during gatherings. Terence also remembered unfamiliar individuals coming to the house to sell drugs to his father or collect money from him.

Terence noted that his father's marijuana use eventually became problematic when Hobart's, where Chester had worked for many years, began implementing workplace drug testing policies. Drug testing policies continued to create difficulties when he later went to work in maintenance for Montgomery County Schools and was placed on work place probation after testing positive for drug use.

For Terence and his brother, these episodes meant their father's job, and the family's financial stability, were always at risk. As children, they were aware of the tension surrounding these situations but had little understanding of what was happening or how it might affect the family.

Terence described noticeable changes in his father over time, explaining that his drug use appeared to contribute to increasing paranoia, depression, and isolation. Chester kept to himself, spent long periods alone in his room, and rarely engaged with Terence or his brother. Terence said his father never played with them, threw a ball, or attended their sporting events.

4

Chad and Dorothy similarly described Chester as emotionally and physically absent within the family. Dorothy said that Chester was rarely warmly available to her or their children. She described him as a quiet and distant person who struggled to express feelings or engage in meaningful conversations within the family.

Looking back, Terence said the family never functioned as a cohesive unit. They did not take vacations together or go out to dinner as a family. When his father was home, he was typically withdrawn and secluded, which contributed to ongoing tension in his parents' relationship.

Dorothy said that Chester's own upbringing contributed to this pattern. Chester's mother was in her fifties when he was born, and much of his early care reportedly fell to older siblings rather than his parents. As a result, Dorothy believes Chester grew up without consistent structure or clear examples of healthy relationships. Within the household he later created with Dorothy, this translated into a parenting style that focused primarily on providing and maintaining order, rather than emotional connection.

Terence's son, Brayden described a family environment on his father's side that placed strong emphasis on control, presentation, and adherence to expectations. Brayden said, "my father's side of the family never showed emotion. I don't think they wanted anyone to think they might be less than. They didn't allow for any individual thinking or freedom, and they made it very clear what the standards and expectations were. Expressing yourself wasn't even an option. While Brayden recalled that his father showed affection through actions, such as hugging his children and remaining physically present, he did not express emotions outwardly. Over time, Brayden observed that this dynamic contributed to distance within his own household, particularly as his mother later withdrew emotionally from the marriage in response to his father's limited emotional expression.

In addition to mental health concerns on Terence's maternal side, they were also present within Terence's paternal family. Terence's paternal uncle, Bobby Joe Clemons, suffered from agoraphobia and lived with Terence's paternal grandmother, Christine, for much of his adult life. Bobby Joe never left the house and was diagnosed with depression after a suicide attempt. Family members also described a strong history of alcoholism among relatives on the paternal side of the family.

Taken together, these early experiences placed Terence in a home where survival needs were met, but neglect operated through emotional distance, fragmented caregiving, and limited parental engagement with the children's development. His father was physically present at times but emotionally withdrawn, increasingly shaped by substance use, isolation, and volatility. Within that environment, Terence was exposed early to adult behavior, including substance use and sexualized conduct among older peers, without the maturity, supervision, or explanation needed to understand it. Research on childhood emotional neglect links such environments to later depressive symptoms and internalized coping.[1]

**Education and Social Development in Sharpsburg**

Terence began kindergarten at Mt. Sterling Elementary School, where he remained through the fifth grade. During these early school years he earned mostly As and Bs and enjoyed playing soccer both in the neighborhood and on a traveling team. Initially, Terence rode the school bus, but by the fifth grade the family had moved to Sharpsburg, and he began walking home from school. At that time, the family was living in the Twinbrook Drive Apartments, a small two-bedroom, one-bathroom unit.

In contrast to Mt. Sterling, Sharpsburg remained informally segregated, with Black families concentrated in a small section of town that had historically received fewer services and less investment. Terence recalled that many homes on "Back Street" lacked basic infrastructure, including city sewage, and that the racial separation in town was obvious to him even as a child.

After the family moved to Sharpsburg, Terence and his brother spent most of their time outside the home with extended family members and neighborhood youth, many of whom were several years older than them. Dorothy recalled that it was not uncommon for as many as forty relatives and neighbors to gather on the street at one time, creating a surrounding where younger children were routinely bounded by older adolescents and adults.

Terence described himself as the timid child in comparison to his younger brother, Chad, who was outgoing and more physically assertive. Because Terence was smaller in stature, he felt that Chad often drew more attention from peers, which instilled an early sense of inadequacy in Terence.

During this same period, tensions within the household were increasing. Terence recalled the first time his mother discovered that his father had been unfaithful and the arguments that followed between his parents. Dorothy explained that despite the strain on the marriage, her family did not believe in divorce, and she chose to remain in the relationship even when it created volatility within the home, a pattern she witnessed with her mother. As conflict at home intensified and both parents remained occupied with work and ongoing stress, Terence and Chad spent increasing amounts of time in these unsupervised neighborhood settings, where much of their early social development occurred through observation and interaction with significantly older relatives and peers.

Chad said that within this Sharpsburg family community, conversations among older boys and men frequently centered on adult topics, including sexual relationships. Younger boys were often encouraged to listen, watch pornography, and sexually emulate what older males described as markers of maturity and masculinity. Chad recalled situations in which older cousins would be present with their girlfriends and would attempt to pair elementary school boys with middle school girls. He further explained that there were so many different age groups interacting that their developmental timelines didn't always match up.

6

Chad explained that he and Terence were often pressured by older family members to participate in behaviors that were treated as normal within those social circles, and that they were instructed not to discuss these interactions with adults. Looking back, he described these experiences as part of a broader environment in which sexual behavior was introduced prematurely, discussed openly among older peers, and treated as a marker of maturity rather than something bounded by age-appropriate limits.

Developmental research has long recognized that early exposure to sexualized behavior outside the context of guidance or supervision can disrupt the formation of healthy boundaries and contribute to later confusion about sexual norms and interpersonal limits.[2] Research on adolescent sexual socialization has found that peer sexual norms and pressure can shape attitudes and behavior, particularly where older peers carry status and influence.[3]

### Adolescence: Loss of Stability and Declining Self-Esteem

Terence attended McNabb Middle School for 6th and 7th grade. His middle school years coincided with one of the most financially difficult periods for his family. Around this time, Hobart, the company where his father had worked for many years, closed. Chester struggled to find stable employment afterward, taking temporary work in construction and later working for a cleaning company before working for Montgomery County Schools. The family began experiencing serious financial strain and had difficulty paying household bills.

The financial hardship had immediate effects on Terence's daily life. He was forced to stop playing travel soccer, an activity he had enjoyed and relied on for structure and social connection. Terence recalled that his clothes became worn and that his mother often relied on the local food pantry to help feed the family.

To make up for the loss of income, Dorothy began working multiple jobs to help support the family, which meant she was away from home almost all day and had even less time to provide supervision and support for her sons. She worked for a construction company, NH Stoning, Inc., where she is currently the head of human resources, as well as a job at Walmart and Mary Child's Hospital. With his mother working extended hours across three jobs, Terence spent much of adolescence on his own, without consistent adult presence or oversight.

This period also coincided with growing social difficulties for Terence. He described himself as remaining physically smaller than many of his peers and recalled being bullied and teased by other students, a pattern that lasted through high school. After he was forced to stop playing soccer, Terence attempted to participate in other sports but felt discouraged because of his size, explaining that he was too small to compete in basketball or football. Losing access to sports and struggling socially made it difficult for Terence to find a place where he felt confident or accepted. Dorothy confirmed that his size was a driving factor of his emerging mental health challenges.

Looking back, Terence defined this period as the point when his self-esteem began to

collapse. Without the structure and confidence he once found in sports, and with increasing financial stress at home, he began experiencing what he now recognizes as early depression. He described himself as a "late bloomer" who struggled to find his footing, often second-guessed himself, and searched for acceptance among peers, keeping that pain to himself. There was no one at home talking through those experiences with him or helping him understand what he was feeling, so he was left to figure it out on his own.

Terence attended Bath County High School from 9th through 12th grade. His brother, Chad said that he grew bigger while Terence stayed the same size. Terence explained that remaining quiet and withdrawn felt benign, as it reduced the chances of being rejected, criticized, or disappointed by others. Terence said his mental health continued to decline and described mornings when he woke up feeling intense self-doubt and self-loathing. Dorothy said that Terence was hoping to "reinvent" himself when he couldn't succeed at sports but had a hard time adjusting.

By high school, he identified only one close friend, Ricky Lloyd. Outside of that friendship, Terence described developing difficulty trusting others, explaining that repeated experiences of disappointment had led him to expect that people would eventually let him down. Recent review literature on adolescent boys and young men reflects that self-reliance, emotional stoicism, and fear of judgment are common barriers to help-seeking, particularly where masculine norms are strongly enforced.[4]

As Terence grew into adolescence, the expectations surrounding masculinity within his family and community began to shape how he understood himself. In the Baptist culture in which he was raised, boys were expected to appear strong, self-reliant, and emotionally controlled, and vulnerability was often viewed as weakness. Dorothy later acknowledged that she often had little insight into what Terence or Chad were experiencing internally as they grew older.

For Terence, identity formation unfolded against a framework of social insecurity, limited parental engagement, and early exposure to adult behaviors he did not fully understand. Without a stable framework for interpreting those experiences, his sense of self became increasingly tied to external approval and performance. Acceptance from peers, success in athletics, and later professional achievement became important sources of validation, a pattern that would continue shaping how he evaluated himself well into adulthood.[5]

During high school, Terence also became increasingly aware of the racial dynamics around him and the pressure he felt to succeed. Growing up as one of the few Black students in parts of his community, he recalled feeling that any personal failure would reinforce negative stereotypes about Black people. This pressure added another layer of stress during a time when he was already struggling with self-confidence.

As a result, Terence said he continued to withdraw socially. He explained that staying in

8

his "shell" provided a perceived protection from rejection, criticism, or further disappointment. Even when cousins or friends invited him to spend time with them, he often declined, gradually becoming more of a homebody. Chad said, "when I was out, Terence was not out. He kept to himself and stayed detached."

By his junior year, Terence was finally accepted onto the football team. Within his extended family, sports carried significant social meaning, and playing athletics was often viewed as a marker of belonging and respect. Terence recalled that his father began paying more attention to him once he joined the team, which reinforced how closely athletic participation was tied to identity and acceptance within the family.

Chad confirmed the notion that, "in order to fit in with our father's side of the family, you had to play sports. It wasn't an option." Chad said that Terence was the backup on the team and did not see a lot of playing time.

Earning a spot on the football team did not increase his social interactions. Terence obtained a job at McDonald's at age sixteen. Balancing school, football, and work helped keep his mind occupied and provided routine when he was struggling with isolation and self-doubt.

Terence also began drinking alcohol during this period. Alcohol had long been present at family gatherings and social events, where it was normalized among adults and older relatives. Chad described the family parties as "generational" gatherings where no one was asked for identification because everyone knew who the Clemons were, and Dorothy said the Clemons family had been bootleggers during the 1980s because Sharpsburg was still not a wet county. Terence said he began drinking at sixteen, and that access to alcohol became one way to gain attention and approval from other students who then began socializing with him. Looking back, he recognized that drinking became a way to fit in and blunt the rejection he had already been experiencing.

Chad said that he and Terence were drinking 40oz bottles of beer combined with liquor during high school. Dorothy said she, "had an idea," Terence was struggling with alcohol because she saw a lot of beer bottles.

The influence of alcohol within the family was not without consequence. Terence recalled that one of his uncles was killed by another family member during an alcohol-related dispute, an event that underscored how deeply alcohol was embedded in family dynamics.

Coinciding with his increased alcohol use, Chad said that Terence sustained at least two head injuries while playing football in 1988 and 1989. At the time, formal concussion protocols were not commonly implemented in youth athletics, and Chad recalled that players who appeared injured were often briefly removed from play and treated with smelling salts before returning to the field.

While there is no formal documentation of a traumatic brain injury, these incidents

9

occurred during a developmental period when concussion protocols were minimal, and research now recognizes that repeated head impacts during adolescence can affect mood regulation and impulse control later in life.[6]

**Transition to Adulthood: College and Early Independence.**

As Terence approached graduation from Bath County High School in 1992, he began looking for opportunities that would allow him to establish independence and direction beyond the challenges he had experienced growing up. Although adolescence had been marked by periods of social withdrawal, low self-esteem, and attempts to cope through alcohol and peer acceptance, Terence also sought environments that offered structure and a sense of purpose. After graduating, he enrolled at Eastern Kentucky University, where he began the next stage of his development as a young adult navigating increased independence, academic expectations, and new social pressures.

Unfortunately, Terence reported that his alcohol use escalated significantly at Eastern Kentucky. He described drinking heavily with the intention of "passing out" and acknowledged that alcohol began affecting both his academic performance and his ability to maintain consistent routines. Terence recalled occasions when he reported to work intoxicated and said that his grades declined to the point that he nearly faced removal from his academic program.

In an effort to stabilize his situation and continue paying for school, Terence joined the Kentucky Army National Guard, following in the footsteps of his brother, Chad, who had already enlisted. Military service provided a degree of accountability and financial support that helped Terence remain enrolled in college while also introducing him to a disciplined environment that differed from the instability he had previously experienced during high school.

Initially, Terence planned to pursue a career in teaching. However, due in part to his academic struggles during this time, he ultimately changed his major to Corrections and Juvenile Services. Through those courses, Terence developed an interest in working with youth and learning about the juvenile justice system. He later described this shift as a turning point in his academic direction, as the subject matter aligned with his growing desire to work with young people who were navigating difficult circumstances.

While enrolled at Eastern Kentucky, Terence met his wife, Alisha, who lived next door to his family. The relationship began during a period when he was already balancing school, military obligations, alcohol misuse, and growing adult responsibilities. Dorothy recalled having concerns about the relationship because Terence was already under strain and appeared increasingly overwhelmed. Family members also described tension between the two households, including racial hostility from Alisha's stepfather and instability within her home. Chad recalled that Terence often had difficulty saying no, tended to avoid conflict, and was susceptible to staying in relationships even when they added stress. Terence graduated from Eastern Kentucky in 1996 and married Alisha in 1997, who was still in high school. By then, he was entering adulthood with two young children and mounting responsibilities while many of

the patterns established in adolescence remained unchanged.

**Military Leadership and Early Career Responsibilities**

As Terence moved further into adulthood, he began assuming increasing responsibilities both within his family and through his military service. After several years balancing multiple commitments, Terence continued his service with the Kentucky Army National Guard, where he sought greater stability and professional direction. Military records reflect that Terence progressed through officer training and was later commissioned as a Second Lieutenant in June 1999. During this time, he participated in regular training assignments that required weekend travel, including training activities in Missouri.

Military records also reflect that Terence was viewed as a capable and promising service member during this period. Training evaluations noted his reliability, leadership potential, and willingness to take on responsibility within his unit. Over the course of his service, Terence received several military decorations and commendations, including the Army Reserve Component Achievement Medal, the Army Service Ribbon, the Kentucky Commendation Ribbon, and the Kentucky State Active Duty Ribbon. These recognitions reflected consistent participation, dedication to training, and the development of leadership skills within the National Guard.

While Terence valued the discipline and structure the military provided, the increasing time commitments on the weekends created tension with his responsibilities at home. Terence said that the travel and time away from home began to weigh heavily on him, as he did not want to repeat what he had experienced growing up with a father who was frequently absent from family life.

Terence said he continued to struggle privately with feelings of low self-worth and depression that had been present since adolescence. Rather than discussing these struggles openly, he described relying on solitary coping behaviors that allowed him to temporarily escape feelings of inadequacy. Among those behaviors, Terence reported that he began using pornography more frequently during this time. Looking back, he described the behavior as something that provided temporary distraction and a sense of validation during periods when he felt overwhelmed, detached, or depressed.

After his time with the National Guard, Terence began building a professional career focused on youth development and community engagement while also supporting his growing family. He worked at a Juvenile Justice Center from 2000 to 2005 as a social service clinician and counselor. In November 2005, he was hired by the University of Kentucky Cooperative Extension Service as a County Extension Agent for 4-H Youth Development. In this role, Terence was responsible for organizing and leading youth programs throughout the county, coordinating educational activities, mentoring students, and working closely with schools and community organizations.

During the early years of Terence and Alisha's marriage, the couple worked to establish financial stability while raising their young children. Dorothy said the couple initially lived in a mobile home in Mt. Sterling shortly after marrying. However, they were not able to pay the rent, and she helped them rent an apartment for a period as they attempted to stabilize their finances.

As Terence continued working and developing his career, the family gradually moved through a series of housing transitions to improve their circumstances. Dorothy said that the couple eventually rented a house before purchasing a home in Owingsville through a GI loan associated with Terence's military service. In time, the family relocated again and eventually settled in Lexington.

Both Terence and members of his family later described a growing sense of pressure within the marriage related to financial stability and upward mobility. According to Dorothy, Alisha frequently expressed a desire for improved living conditions and greater financial security for the family. Whether these expectations were real or perceived, Terence described feeling increasing pressure to provide more for his family, including larger homes, newer vehicles, and greater financial success. At the same time, he was attempting to balance the demands of his military service, professional responsibilities, and raising two young children. Terence later reflected that much of this pressure was something he internalized rather than seeking help to lessen the burden.

Dorothy reflected that she tried to support her children whenever possible, but in 2006, she was diagnosed with breast cancer. This added another source of anxiety for Terence. Dorothy successfully completed four rounds of chemotherapy and radiation.

Over the course of nearly two decades with the University of Kentucky Cooperative Extension Service, Terence developed a reputation as a committed and reliable employee focused on youth development. His role as a 4-H Youth Development Agent involved coordinating leadership programs, school-based initiatives, and community activities designed to provide young people with educational opportunities and mentorship. Performance evaluations noted his willingness to take initiative, his ability to connect with youth participants, and his consistent engagement with schools, families, and community leaders throughout the county. Over time, Terence became a familiar presence within the local school system through his work supporting 4-H programs and student activities.

Terence's son, Brayden described the significant reputation his father maintained within the community through his work with youth. He explained that Terence was widely known as the "4-H Man" and was respected for his involvement in local schools and youth programs. According to Brayden, when community members found out he was a Clemons, they frequently expressed admiration for his father's work, noting the opportunities he created for young people, particularly those who lacked a sense of belonging. Brayden recalled specific initiatives, including a skateboarding club, that provided students with a space to feel accepted and confident. Brayden said, "it was a priority of my father's to help youth feel like they had an

outlet and could be themselves." He further stated that even after his father's arrest, individuals who knew him through his work continued to speak highly of him and remembered him for his contributions to the community rather than solely for the conduct in this case.

Growing up, Brayden described his father as both strict and highly involved throughout his childhood. He explained that while both parents enforced rules, his father held them to particularly high standards, emphasizing discipline, accountability, and personal responsibility. Despite this, Brayden described his childhood as positive, recalling family trips, consistent involvement in school and extracurricular activities, and a strong sense of structure within the home. He stated that his father was "hard but fair" and credited those expectations with shaping his own success as an adult. Brayden emphasized that his father was consistently present, attending events and participating actively in family life.

Brayden also described his father as having what he experienced as two distinct ways of functioning. At home, he could be playful and engaged, spending time with his children and participating in family time. In other settings, particularly in professional environments, Brayden described him as more stoic and reserved. He also recalled periods when his father appeared mentally preoccupied or distracted, at times seeming unable to recall recent conversations.

During this stage of adulthood, Terence appeared to function successfully across multiple domains of his life, which reinforced the perception that he was stable and dependable. Beneath that outward competence, however, the psychological patterns established earlier in his development remained the same. Having grown up in an environment where personal struggles were rarely articulated or examined, he developed a pattern of emotional inhibition and self-reliant coping. Rather than seeking help or confronting internal conflict directly, he managed it privately while continuing to meet external expectations. Over time, this pattern allowed him to sustain outward stability while unresolved psychological strain accumulated beneath the surface of his functioning. Research on suppression-based coping has shown that individuals who routinely conceal internal difficulties are more likely to experience worsening anxiety and depressive symptoms over time.[7]

### Marital Deterioration, Validation-Seeking, and Escalating Psychological Strain

Terence described his relationship with Alisha as becoming progressively more strained over the years. He said that as they grew apart emotionally, their intimate relationship also became increasingly dysfunctional and emotionally distant. Rather than seeking counseling or openly confronting the deterioration in the marriage, both continued functioning within the relationship while resentment and disconnection deepened over time.

Brayden described longstanding tension in his parents' relationship related to financial expectations and lifestyle differences. He characterized his mother as valuing social engagement and material stability, including maintaining a certain standard of living, which he believes placed additional pressure on his father. Brayden recalled a period during which his

mother earned more income, which he understood as contributing to his father's sense of inadequacy. He described these dynamics as ongoing sources of strain within the marriage over time.

By the late 2010s, the pressures in Terence's life were no longer occurring separately but were converging across multiple domains. Marital deterioration, financial pressure, grief, and years of privately managed internal conflict were acting on a coping style already organized around secrecy, emotional inhibition, and self-reliance. Under those conditions, short-term relief began to assume greater importance. Behaviors that briefly reduced internal anguish carried greater weight because they offered escape from problems he did not know how to confront directly. Research on stress and decision-making shows that prolonged psychological strain, particularly when paired with secrecy-based coping, can narrow attention toward immediate relief and weaken fuller consideration of long-term consequences.[8]

The events leading up to the offense did not arise in isolation. By that point, the deterioration of his marriage, unresolved depression and anxiety, the death of his father, and years of private, unaddressed suffering had converged. None of those circumstances excuse the conduct. The harm is serious and undeniable. But they do provide context for how Terence's judgment deteriorated over time within a psychological framework that had long depended on concealment, shame, and avoidance rather than reflection, intervention, or treatment.

**Mental Health History and Clinical Findings**

Many of the emotional struggles described throughout Terence's life remained unaddressed for years, a pattern that is now independently corroborated by clinical records documenting longstanding symptoms of anxiety and depression. On September 11, 2024, Terence underwent a clinical assessment at New Vista of the Bluegrass Community Mental Health Center in Lexington, Kentucky, conducted by Ashton M. Stamper, LPCA. During that evaluation, Terence reported persistent symptoms of anxiety and depression, including chronic worry, racing thoughts, sleep disturbance, loss of motivation, and a pervasive sense of personal failure. Clinical screening instruments administered during the evaluation yielded a PHQ-9 score of 18, reflecting moderately severe depressive symptoms. Based on the clinical interview and assessment findings, the evaluating clinician diagnosed Terence with Major Depressive Disorder, Recurrent, Moderate (DSM-5 F33.1) and Generalized Anxiety Disorder (F41.1).

Importantly, the evaluation notes that Terence reported experiencing depressive symptoms for several years prior to the legal investigation, including worsening distress during the period surrounding his father's lung cancer diagnosis and death in 2020 as well as ongoing marital strain. New Vista records also documented passive thoughts of being better off dead, a positive depression screen, and moderately severe depressive symptoms, further corroborating the depth of his preexisting distress. These findings are consistent with the longstanding patterns of emotional suppression, low self-worth, and avoidant coping described earlier in this report. Although Terence continued to function outwardly through his employment and community roles, the clinical record reflects that these underlying symptoms had remained

14

untreated for years.

**Presentence Investigation Report Context**

The Presentence Investigation Report places Terence before the Court as a first-time offender with no prior criminal convictions or documented history of unlawful conduct. Throughout his adult life, Terence maintained stable employment, served in the Kentucky Army National Guard, and spent nearly two decades working with youth through the University of Kentucky Cooperative Extension Service as a 4-H Youth Development Agent. His criminal history category reflects that this case represents the first instance in which he has ever been involved in the criminal justice system.

The seriousness of the conduct before the Court cannot be understated. The offense involves conduct that carries significant legal consequences and raises legitimate concerns about risk and accountability. At the same time, the record does not reflect a longstanding pattern of criminal behavior or a history of predatory conduct.

The contrast between Terence's prior life history and the conduct underlying this case is important for the Court's sentencing analysis. As outlined throughout this report, the years preceding the offense were marked by escalating psychological strain, marital deterioration, untreated depression and anxiety, and increasing reliance on avoidant coping strategies. While none of these factors excuse the offense conduct, they provide context for understanding how Terence's decision-making deteriorated during a period of significant personal and psychological instability.

The Court is therefore presented with an individual whose life history reflects both long-standing vulnerabilities and decades of otherwise productive functioning prior to the offense. Terence has no record of violence and no evidence of a sustained pattern of prior unlawful sexual behavior. These factors are relevant when evaluating both the nature of the offense and the likelihood of future risk.

Equally important is Terence's recognition that he requires ongoing psychological treatment. As reflected in the clinical evaluation discussed earlier in this report, he has been diagnosed with Major Depressive Disorder and Generalized Anxiety Disorder and has expressed a willingness to engage in counseling to address longstanding patterns of shame, emotional suppression, and maladaptive coping. Effective treatment targeting these issues is an important component of reducing future risk and promoting long-term accountability.

The Presentence Investigation Report correctly calculates the advisory guideline range under the current framework. At the same time, the resulting guideline outcome is driven by a series of cumulative enhancements that are broadly applicable in many modern child-exploitation cases and therefore do not necessarily distinguish among offenders based on life history, psychological functioning, or prior criminal conduct. In Terence's case, the guideline range is shaped not only by the seriousness of the offense, but also by structural features of the

15

guideline scheme that produce extremely severe sentencing outcomes even for first-time offenders with no prior criminal history. This context is relevant to the Court's individualized analysis under 18 U.S.C. § 3553(a), particularly in assessing how much weight the advisory guideline range should receive in relation to the specific history and characteristics presented here.

**Summary and Sentencing Considerations**

Terence's developmental history reflects a life shaped by emotional neglect, early exposure to adult behavior without supervision, and a persistent search for acceptance in environments where security was absent. He grew up in a home where work, discipline, and survival took priority over developmental norms, and he was taught to contain distress rather than voice it. At the same time, he was exposed prematurely to sexualized behavior and substance use among older peers and relatives without the maturity or guidance needed to understand those experiences in a healthy way.

Over time, Terence came to rely on performance, responsibility, and outward competence as substitutes for a stable sense of self. That strategy allowed him to function for decades as a soldier, veteran, professional, and mentor to youth while suffering from untreated depression and anxiety. His life was not organized around criminal conduct. He had no prior criminal record, maintained steady employment, served in the Kentucky Army National Guard, and spent nearly two decades working with young people through the University of Kentucky Cooperative Extension Service. These facts do not diminish the seriousness of the offense, but they do require the Court to consider what changed.

The evidence presented in this report shows that the stability Terence appeared to maintain for many years rested on a far more fragile internal foundation. Although his childhood did not involve overt physical abuse, it unfolded in an environment marked by chronic emotional neglect.

The Clemons household was marked by parental dysfunction and limited parental engagement with the children's development. Confusion, fear, and insecurity were not examined or explained. As a result, Terence learned that understanding and managing difficult experiences was something he would have to figure out by himself. Over time, approval and belonging became tied less to emotional connection and more to performance, achievement, and meeting expectations. Those developmental patterns remained unresolved well into adulthood.

In the years preceding the offense, longstanding vulnerabilities began to collide with increasing psychological strain. Marital deterioration, chronic stress, untreated depression and anxiety, and the death of his father compounded patterns of secrecy, shame, and emotional isolation that had developed much earlier in his life. The record therefore reflects not a life defined by predatory conduct, but a deterioration in judgment that occurred within a specific and increasingly unstable psychological context.

16

The social history presented here provides the Court with a fuller understanding of how Terence's decision-making deteriorated in the years leading up to the conduct before the Court. The record reflects a late-emerging collapse in judgment within a narrowed psychological framework, rather than the development of a lifelong predatory identity.

Understanding that distinction is important for sentencing. Empirical research on sexual offense recidivism also provides important context for evaluating future risk. Large-scale longitudinal studies consistently show that individuals with no prior sexual offense history present substantially lower rates of reoffending than those with established patterns of sexual misconduct. Studies of sexual offense recidivism among federal offenders show that first-time offenders, particularly those with stable employment histories and no prior criminal conduct, generally fall within lower risk categories for future sexual offending when compared with individuals who demonstrate longstanding behavioral patterns or repeated offenses. These findings are consistent with the circumstances presented here, where the conduct before the Court represents an isolated criminal episode within an otherwise law-abiding life history rather than part of a sustained pattern of predatory behavior.[9]

Long-term accountability in this case must therefore include not only penalty, but also structured supervision and specialized treatment directed at the psychological patterns that contributed to the offense. The Bureau of Prisons offers Sex Offender Treatment Programs (SOTP) designed specifically to address problematic sexual behavior through cognitive-behavioral therapy, accountability frameworks, and relapse-prevention planning. Participation in such programs, combined with structured supervision following release, provides a well-established mechanism for managing risk while addressing the underlying factors that contributed to the conduct before the Court.

Terence also continues to have meaningful support from his family and community, which is an important protective factor in reducing future risk and supporting rehabilitation. His mother, brother, and son have all remained in contact with him and continue to offer support despite the seriousness of the offense. Brayden, in particular, described maintaining a close relationship with his father, stating that, "He is still my father. We speak regularly and I do not want him to feel isolated or excluded from the family." In addition to family support, former colleagues and community members familiar with Terence's work in youth development have continued to express respect for his contributions and character. Research on desistance and recidivism consistently identifies stable social support and prosocial community ties as key factors associated with lower rates of reoffending and improved outcomes following release. In this case, those supports remain intact and provide a concrete foundation for accountability, structured reintegration, and reduced risk of reoffending.[10]

The risks identified in this case are tied to untreated psychological symptoms, chronic relational disconnection, shame-based coping, and prolonged emotional suppression—factors that are serious but identifiable and responsive to structured intervention. When paired with regulated supervision and ongoing monitoring, these interventions provide a well-established framework for managing risk while addressing the underlying factors that contributed to the

conduct before the Court. In this context, the available evidence suggests that Terence's behavior is best understood not as the product of a persistent predatory identity, but as a late-emerging breakdown in judgment within a specific psychological and relational context and is one that can be addressed through accountability, treatment, and carefully structured supervision.

This memorandum is a summary of the substance of my work.

Respectfully submitted,
Christine Penry

900 N Randolph Street, #1800 Arlington, VA 22203
Email: christinepenry@gmail.com Phone: (703) 300-3271

---

[1] Glickman EA, Choi KW, Lussier AA, Smith BJ, Dunn EC. Childhood Emotional Neglect and Adolescent Depression: Assessing the Protective Role of Peer Social Support in a Longitudinal Birth Cohort. Front Psychiatry. 2021 Aug 9;12:681176. doi: 10.3389/fpsyt.2021.681176. PMID: 34434126; PMCID: PMC8381469.

[2] See Friedrich, W.N., Fisher, J.L., Broughton, D., Houston, M., & Shafran, C. (1998). *Normative sexual behavior in children: A contemporary sample.* Pediatrics, 101(4), e9; Brown, J.D., Halpern, C.T., & L'Engle, K.L. (2005). *Mass media as a sexual super peer for early maturing girls.* Journal of Adolescent Health, 36(5), 420–427.

[3] van de Bongardt D, Reitz E, Sandfort T, Deković M. A Meta-Analysis of the Relations Between Three Types of Peer Norms and Adolescent Sexual Behavior. Pers Soc Psychol Rev. 2015 Aug;19(3):203-34. doi: 10.1177/1088868314544223. Epub 2014 Sep 12. PMID: 25217363; PMCID: PMC5871927.

[4] Sheikh A, Payne-Cook C, Lisk S, Carter B, Brown JSL. Why do young men not seek help for affective mental health issues? A systematic review of perceived barriers and facilitators among adolescent boys and young men. Eur Child Adolesc Psychiatry. 2025 Feb;34(2):565-583. doi: 10.1007/s00787-024-02520-9. Epub 2024 Jul 14. PMID: 39004687; PMCID: PMC11868194.

[5] Erikson, E. H. (1968). *Identity: Youth and crisis.* New York: W. W. Norton.

[6] McKee, A. C., & Robinson, M. E. (2014). Military-related traumatic brain injury and neurodegeneration. *Alzheimer's & Dementia, 10*(3), S242–S253.

[7] Young KS, Sandman CF, Craske MG. Positive and Negative Emotion Regulation in Adolescence: Links to Anxiety and Depression. Brain Sci. 2019 Mar 29;9(4):76. doi: 10.3390/brainsci9040076. PMID: 30934877; PMCID: PMC6523365.

[8] See Roy F. Baumeister, Todd F. Heatherton & Dianne M. Tice, *Losing Control: How and Why People Fail at Self-Regulation* (Academic Press 1994); Kathleen D. Vohs & Roy F. Baumeister, "Self-Regulation and Self-Control," in *Handbook of Self-Regulation: Research, Theory, and Applications* (2d ed. 2011).

[9] Hanson, R. K., Harris, A. J. R., Helmus, L., & Thornton, D. (2014). *High-risk sex offenders may not be high risk forever.* Journal of Interpersonal Violence, 29(15), 2792–2813.

[10] Bales, W. D., & Mears, D. P. (2008). Inmate social ties and the transition to society: Does visitation reduce recidivism? *Journal of Research in Crime and Delinquency, 45*(3), 287–321. https://doi.org/10.1177/0022427808317574

18